# EXHIBIT 1

# Case Docket Entries

CC-06-2025-C-528

| | |
|---|---|
| Court: **Circuit** | County: **06 - Cabell** |
| Judge: **Chad S. Lovejoy** | Case Type: **Civil** |

Created Date: **11/4/2025**    Security Level: **Public**

Case Sub-Type: **Contract**    Status: **Open**

Related Cases:

Style: **MARSHALL HEALTH NETWORK d/b/a ST. MARY'S MEDICAL CENTER, Glendale v. MOLINA HEALTHCARE OF OHIO, INC.; and DOES 1 THROUGH 25, INCLUSIVE**

| | Entered Date | Event | Ref. Code | Description |
|---|---|---|---|---|
| 1 | 11/4/2025 3:58:41 PM | E-Filed | | Complaint |
| | 1-1  11/4/2025 | Civil Case Information Statement | | |
| | 1-2  11/4/2025 | Complaint - Complaint | | |
| | 1-3  11/4/2025 | Supporting Document - Exhibit A to Complaint | | |
| | 1-4  11/4/2025 | Transmittal | | |
| | 1-5  11/4/2025 | Summons | | |
| 2 | 11/4/2025 3:58:41 PM | Judge Assigned | J-06011 | Chad S. Lovejoy |
| 3 | 11/4/2025 3:58:41 PM | Party Added | D-001 | MOLINA HEALTHCARE OF OHIO, INC.; and DOES 1 THROUGH 25, INCLUSIVE |
| 4 | 11/4/2025 3:58:41 PM | Party Added | P-001 | MARSHALL HEALTH NETWORK d/b/a ST. MARY'S MEDICAL CENTER, Glendale |
| 5 | 11/4/2025 3:58:41 PM | Attorney Listed | P-001 | A-14735 - Lauren Kathleen Miller |
| 6 | 11/4/2025 3:58:41 PM | Attorney Listed | P-001 | A-14520 - Marcus Rockwell Morrow |
| 7 | 11/4/2025 3:58:41 PM | Service Requested | D-001 | Filer - Private Process Server |
| 8 | 11/6/2025 1:18:21 PM | E-Filed | | Order - Case - INITIAL CASE ORDER |
| | 8-1  11/6/2025 | Order - Case - INITIAL CASE ORDER | | |
| | 8-2  11/6/2025 | Transmittal | | |



**null / ALL**
**Transmittal Number: 32733821**
**Date Processed: 11/19/2025**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Eric Alderete<br>Molina Healthcare, Inc. (Long Beach)<br>200 Oceangate<br>Ste 100<br>Long Beach, CA 90802-4317 |
| **Electronic copy provided to:** | Jeff Barlow<br>Yuri Cardenas<br>Elizabeth Adelakun<br>Tonya Mora<br>Lorena Becerril<br>Wendy Tseng<br>Megan McAndrews |

| | |
|---|---|
| **Entity:** | Molina Healthcare Of Ohio, Inc.<br>Entity ID Number 2705348 |
| **Entity Served:** | Molina Healthcare of Ohio, Inc. |
| **Title of Action:** | Marshall Health Network d/b/a St. Mary's Medical Center vs. Molina Healthcare of Ohio, Inc. |
| **Matter Name/ID:** | Marshall Health Network d/b/a St. Mary's Medical Center vs. Molina Healthcare of Ohio, Inc. (18227818) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Cabell County Circuit Court, WV |
| **Case/Reference No:** | CC-06-2025-C-528 |
| **Jurisdiction Served:** | Ohio |
| **Date Served on CSC:** | 11/19/2025 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Law Offices of Stephenson, Acquisto & Colman, Inc.<br>312-626-1870 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

 West Virginia E-Filing Notice

CC-06-2025-C-528

Judge: Chad S. Lovejoy

**To:** MOLINA HEALTHCARE OF OHIO, INC.; and DOES 1
THROUGH 25, INCLUSIVE
CORPORATION SERVICE COMPANY
1160 DUBLIN ROAD, SUITE 400
COLUMBUS, OH 43215

# NOTICE OF FILING

IN THE CIRCUIT COURT OF CABELL COUNTY, WEST VIRGINIA
MARSHALL HEALTH NETWORK d/b/a ST. MARY'S MEDICAL CENTER, Glendale v.
MOLINA HEALTHCARE OF OHIO, INC.; and DOES 1 THROUGH 25, INCLUSIVE
CC-06-2025-C-528

The following complaint was FILED on 11/4/2025 3:58:36 PM

Notice Date:    11/4/2025 3:58:36 PM

Michael J. Woelfel
CLERK OF THE CIRCUIT COURT
Cabell County
750 5th Avenue, Suite 114
HUNTINGTON, WV 25701

(304) 526-8622

# SUMMONS

E-FILED | 11/4/2025 3:58 PM
CC-06-2025-C-528
Cabell County Circuit Clerk
Michael J. Woelfel

## IN THE CIRCUIT COURT OF CABELL COUNTY, WEST VIRGINIA
### MARSHALL HEALTH NETWORK d/b/a ST. MARY'S MEDICAL CENTER, Glendale v. MOLINA HEALTHCARE OF OHIO, INC.; and DOES 1 THROUGH 25, INCLUSIVE

Service Type:    Filer - Private Process Server

NOTICE TO:    MOLINA HEALTHCARE OF OHIO, INC.; and DOES 1 THROUGH 25, INCLUSIVE, CORPORATION SERVICE
COMPANY, 1160 DUBLIN ROAD, SUITE 400, COLUMBUS, OH 43215

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Lauren Miller, 1114 Dover Ct, , Batavia, IL 60510

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

| 11/4/2025 3:58:36 PM | /s/ Michael J. Woelfel |
|---|---|
| Date | Clerk |

RETURN ON SERVICE:

☐  Return receipt of certified mail received in this office on _____

☐  I certify that I personally delivered a copy of the Summons and Complaint t _____

☐  I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling or usual place of abode to
_____ , someone who is eighteen (18) years of age or above and resides there.

☐  I certify that I personally delivered a copy of the Summons and Complaint to _____ , an agent or attorney-
in-fact authorized by appointment or statute to receive service of process for the individual.

☐  I have reviewed documentation authorizing the above-named person to accept service on
behalf of the individual named on the summons.

☐  I have not reviewed documentation authorizing the above-named person to accept service
on behalf of the individual named on the summons.

☐  Not Found in Bailiwick

| _____ | _____ |
|---|---|
| Date | Server's Signature |

E-FILED | 11/4/2025 3:58 PM
CC-06-2025-C-528
Cabell County Circuit Clerk
Michael J. Woelfel

## IN THE CIRCUIT COURT OF CABELL COUNTY, WEST VIRGINIA
### CIVIL DIVISION

| | | |
|---|---|---|
| MARSHALL HEALTH NETWORK d/b/a ST. MARY'S MEDICAL CENTER, | ) ) ) | |
| Plaintiff, | ) ) | Case No. XXXXX |
| v. | ) ) ) | |
| MOLINA HEALTHCARE OF OHIO, INC.; and DOES 1 THROUGH 25, INCLUSIVE, | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) | |

### PLAINTIFF MARSHALL HEALTH NETWORK'S COMPLAINT AT LAW

1.    Plaintiff, MARSHALL HEALTH NETWORK d/b/a ST. MARY'S MEDICAL CENTER (hereinafter "MHN"), by and through its attorneys, LAW OFFICES OF STEPHENSON, ACQUISTO & COLMAN, for its Complaint at Law ("Complaint") against MOLINA HEALTHCARE OF OHIO, INC., (hereinafter "MOLINA"), and DOES 1 THROUGH 25, INCLUSIVE, upon personal information as to their own activities and upon information and belief as to the activities of others and all other matters, and states as follows:

### INTRODUCTION

2.    This is an action against MOLINA for breach of implied-in-fact contract and *quantum meruit* arising from a business relationship between MHN and MOLINA. By this action, MHN seeks compensatory damages, interest, and costs.

### PARTIES

3.    Plaintiff MHN is non-profit corporation, organized and existing pursuant to the laws of the State of West Virginia for the business purpose of health care and social assistance.

MHN has its principal place of operation in Huntington, West Virginia. MHN provides medical care to patients. MHN provided medical care to Patients (as such term is defined herein), who were MOLINA beneficiaries when such medical care was provided.

4.      MOLINA is a domestic insurance company with a principal place of business in Columbus Franklin, Ohio.

5.      MHN is unaware of the true names and capacities, whether corporate, associate, individual, partnership or otherwise of defendants DOES 1 through 25, inclusive, and therefore sues such defendants by such fictitious names. MHN will seek leave of the Court to amend this Complaint to allege its true names and capacities when ascertained.

6.      MOLINA and Does 1 through 25, inclusive, shall be collectively referred to as "MOLINA" or "Defendants."

7.      Defendants, each of them, at all relevant times, have transacted business in the State of Arkansas. The violations alleged within this Complaint have been and are being carried out in the State of West Virginia.

8.      MHN is informed, believes and thereon alleges that at all relevant times each of the Defendants, including the defendants named "Doe," was and is the agent, employee, employer, joint venturer, representative, alter ego, subsidiary and/or partner of one or more of the other defendants, and was, in performing the acts complained of herein, acting within the scope of such agency, employment, joint venture, or partnership authority, and/or is in some other way responsible for the acts of one or more of the other defendants.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to Article VIII, Section 6 of the West Virginia Constitution and W. Va. Code § 51-2-2, as this is a civil action

seeking damages in excess of the jurisdictional limits of the magistrate court and not otherwise exclusively vested in another tribunal.

10.     This Court has personal jurisdiction over the Defendant pursuant to W. Va. Code § 56-3-33(a), the West Virginia long-arm statute, because Defendant has transacted business in Cabell County, West Virginia, and the causes of action asserted herein arise from Defendant's purposeful activities within the State, including entering into and breaching an implied-in-fact contract formed and performed, in whole or in part, in Cabell County.

11.     Venue is proper in this Court under W. Va. Code § 56-1-1(a)(1), (a)(2), and (a)(7) because the cause of action arose, and the acts and omissions giving rise to the Plaintiff's claims occurred, in Cabell County, West Virginia, and because Defendant transacted business in this County at all times relevant to this Complaint.

## FACTUAL BACKGROUND

12.     MHN, between the dates of December 1, 2019, and October 5, 2024, provided medically necessary treatment to the individuals identified on the spreadsheet attached as Exhibit A[1] to this Complaint (and which is incorporated herein by this reference as though set forth in full) (the "Patients") eleven (11) claims. On the dates of service set forth in Ex. A ("the Dates of Service"), MHN rendered medically necessary services, supplies and/or equipment to Patients until Patients became stable for discharge from MHN.

13.     MHN is informed and believes and thereon alleges that at all relevant times Patients were enrollees and/or beneficiaries of health plans sponsored, financed, administered, and/or funded by MOLINA.

---

[1] MHN has limited disclosure of patient identification here pursuant to the privacy provisions of the Health Insurance Portability & Accountability Act ("HIPAA"), 42 U.S.C. §§ 1320 *et seq*. A more detailed Exhibit can be provided upon entry of a Court ordered, HIPAA compliant protective order.

14.     MHN is informed, believes and thereon alleges MOLINA is financially responsible for the medically necessary services, supplies, and/or equipment (including, but not limited to, emergency care) rendered to the Patients on the Dates of Service.

15.     MHN sought authorization for treatment from MOLINA. MOLINA gave authorization reference numbers, represented that authorization was pending, and/or requested supporting clinical medical records which MHN provided.

16.     Insurance companies like MOLINA receive millions of dollars in premiums collected from their clients and insureds in exchange for the promise of making benefit payments to healthcare providers for emergency and other medical services rendered to their members.

17.     MOLINA received premium payments for Patients' enrollment and coverage in MOLINA's respective health plans.

18.     MOLINA accepted the services MHN provided to Patients as demonstrated by acts including but not exclusive to issuing authorizations and collection of premiums.

19.     MHN's usual and customary charges for the medically necessary services, supplies and/or equipment rendered to Patients amounted to $392,421.11.

20.     MHN timely and properly submitted the bills containing said charges for the medically necessary services, supplies, and/or equipment rendered to Patients to MOLINA for payment.

21.     Rather than properly and fully pay MHN for the medically necessary services, supplies, and/or equipment MHN rendered to the Patients, MOLINA underpaid, issuing payments of $1,199.75. To date, MOLINA owes MHN no less than $390,805.36. Ex. A.

22.     MOLINA failed to pay fully and properly MHN for the medically necessary services, supplies, and/or equipment rendered to Patients, despite demands thereof.

23.     MOLINA has refused, despite MHN's repeated demands, to fully and properly pay MHN the reasonable and customary value of the medical care rendered to MOLINA's beneficiaries as specified in Ex. A. MOLINA has unjustly benefitted by not paying fully MHN for the reasonable value of such services.

24.     MOLINA unjustly benefitted by not paying fully MHN for the reasonable value of such services. MOLINA promised its beneficiaries (including Patients) that it would pay medical providers who provided emergency and necessary medical treatment to those beneficiaries in exchange for Patients' premiums, collected such premiums and then refused despite demands to fully and properly pay MHN the reasonable and customary value of the medical care rendered to MOLINA's beneficiaries as specified in Ex. A. MOLINA accepted the services MHN provided to Patients as demonstrated by acts including but not exclusive to issuing authorizations and collection of premiums.

25.     MOLINA further unjustly and directly benefitted when it caused MHN to treat its beneficiaries, Patients, thus improving MOLINA's patient-population risk pool as Patient was now healthier and less of a cost exposure risk to MOLINA's insurance funds and allowing MOLINA's profits to continue with further guarantee that a healthier and still living Patient would ensure that the MOLINA would be allowed to collect future premiums for Patients' enrollment in MOLINA's health plan.

26.     MOLINA further unjustly and directly benefited when it caused MHN to treat its beneficiaries, Patients, in the following ways:

        a)  Improved Health Outcomes – MOLINA has a vested interest in keeping their enrollees, like Patients, healthy, as healthier individuals require less medical care and incur fewer costs. By encouraging their enrollees, like Patients, to seek medical care when needed,

including hospitalization, when necessary, MOLINA helped prevent Patients' illness from becoming more serious and costly for MOLINA.

b) Better Customer satisfaction – when Patients received quality care at MHN, Patients were more satisfied with their health insurance coverage which led to increased loyalty and retention rates for MOLINA.

c) Increased Market Share – by offering competitive coverage that includes access to high-quality hospitals, like MHN, MOLINA was able to attract new customers and retain existing ones. This helped them gain a larger share of the market which led to increased profits and better bargaining power with healthcare providers.

d) Cost Savings – with an improved health outcome of Patients, MOLINA saved money by avoiding further future costly treatments and is therefore able to keep premiums lower for their customers, further increasing MOLINA's attractiveness and competitiveness in expanding its patient-pool.

27.    As a direct and proximate result of MOLINA's wrongful conduct, MHN has suffered damages in an amount to be proven at trial but not less than the sum of $390,805.36 exclusive of interest.

### *Importance of Insurance Cards*

28.    MOLINA accepted the services MHN provided to Patients as demonstrated by acts including but not exclusive to issuing insurance cards, authorizations, and collection of premiums.

29.    Prior to the dates of service for each Patient, MOLINA issued identification cards to Patients. Those identifications cards contained the following including but not limited to:

a) Copay Amounts for the Patient – including a percentage of amount patient owes for services after deductible, (i.e. $0, 15%, 25%, 35%);

b) Deductible Amounts for the Patient;

c) Instructions of where and how to bill MOLINA for the services provided.

30.    MOLINA instructed Patients to present these identifications cards to the provider; in this case, MHN.

31.    MOLINA informed under the Prudent Layperson Standard which established that emergency room visits would be covered and paid for by MOLINA if a reasonable person would think it's an emergency. *See* 42 U.S.C. §675.

32.    MHN knew, was aware of, and understood this industry custom and practice including that an insurer, like MOLINA could not and would not refuse coverage for a valid emergency under the Prudent Layperson Standard.

33.    MOLINA knew, was aware of and understood that MHN must provide care that is required under EMTALA, specifically the following;

a) Medical Screening Examination (MSE) whereby MHN must provide an appropriate medical screening to any person who comes to the emergency room and requests examination or treatment for a medical condition to determine whether an emergency medical condition (EMC) exists. The MSE must be performed without delay and regard to ability to pay or insurance status. The screening must be the same standard given to any patient with similar symptoms.

b) Stabilization Requirement - If an EMC is found, MHN must provide necessary treatment to stabilize the patient. Stabilization means no material deterioration is likely during transfer/ discharge.

c) Appropriate Transfer - If MHN cannot stabilize the patient it may transfer to another facility only if:

i)      The receiving facility has capacity and agrees to accept the patient; and

ii)     The transfer is medically appropriate

d)  Transfers require written physician certification that benefits outweigh the risks

34.     MOLINA thus anticipated that MHN would submit a claim to MOLINA that MOLINA is legally obligated to review and often pay MHN.

### *Meeting of the Minds Through Communication and Billing*

35.     During the dates of services alleged in Ex. A., MHN and MOLINA engaged in real-time communications during and after the stay, including but not limited to the following:

a)  Pre-Authorization for Certain Services: While most emergency care cannot require prior authorization, once the Patients were stabilized, further care (admissions, surgeries, transfers) may require insurer approval;

b)  Case Management Calls: MOLINA contacted MHNS's case manager to discuss discharge planning or preferred follow-up care;

36.     This is a mini-agreement within the larger framework of providing the care for the patient.

### *Electronic Claim & Payment Systems (Functional Operational Agreement Through Industry Custom and Practice and Standard Billing Practices*

37.     MHN submitted the claims electronically in MOLINA's required format.  This use of the MOLINA's claim submission systems, including but not limited to online portals,  and adherence of MOLINA's claim billing rules is itself part of an ongoing "meeting of the minds" about how healthcare business is done.

38.     The implied operational agreement between MHN and MOLINA in the ER setting is a tacit but real "meeting of the minds" because both sides — by their conduct — demonstrate mutual understanding and acceptance of how claims will be handled after the care is delivered.

39.     Even before the Patients arrived at MHN, both MHN and MOLINA operated

within an established administrative framework that governed the following billing practices:

      i)     Claim format (electronic data interchange standards like ANSI X12 837)

      ii)    Coding requirements (ICD-10, CPT, HCPCS)

      iii)   Supporting documentation (ER notes, test results, operative reports)

      iv)   Payment remittance format (ANSI 835 EDI or equivalent)

      v)    Appeal procedures if the claim is denied

40.     Both parties knew these operational rules and intended to follow them when MHN

delivered care and later sought payment.

### *Mutual Consideration*

41.     MHN's consideration: MHN agreed to submit the claims in MOLINA's required

format, follow the coding guidelines, and abide by MOLINA's claim review process.

42.     MOLINA's consideration: MOLINA agreed to process the claims in good faith

according to those same operational rules and remit payment (or issue a lawful denial) within the

agreed or legally required timeframe.

43.     MHN, by treating the Patients and later submitting a claim in MOLINA's

prescribed way, essentially offered to exchange compliance with the rules for payment.

44.     MOLINA, by processing the claims in that format rather than rejecting it outright

for noncompliance, accepts that operational arrangement.

45.     Both parties knew what the billing rules were and acted as though they were bound

by them.

46.     MHN performed by sending the claims; MOLINA performed by adjudicating and

paying (or denying) the claims.

47.     MHN and MOLINA followed the same operational "rulebook," which was never separately negotiated for these Patients but is universally understood between them.

48.     The meeting of the minds occurred because both Parties, without explicit negotiation at the moment, choose to operate within that same established administrative system with mutual expectations of performance and payment.

### *Industry Custom & Prior History*

49.     Prior to the dates of service, a pattern of behavior had developed that was almost automatic between MOLINA and MHN:

      a)   MHN's registration staff collected insurance details on intake;

      b)   MHN sent an admission notification or real-time eligibility check to the MOLINA; and,

      c)   MOLINA sent back a verification of coverage.

50.     Also upon the issuance of verification of coverage, hospital staff requested authorization for treatment, and MOLINA either gave an authorization number, requested medical records, or indicated that authorization was not needed for the treatment (as indicated on the insurance cards MOLINA created and provided for Patients).

51.     By continuing treatment with this knowledge, both parties acted under an implied understanding of payment and care responsibilities.

52.     MOLINA, though indicating that Patients had verified benefits and coverage, understood that if coverage was established for a patient's treatment, under the industry custom and practice, MHN understood that a confirmation of coverage meant that those services would be paid by MOLINA.

53.     The reason for why MHN interpreted the verification of benefit and establishment

of a service as "covered", is that 1) MOLINA only gave out authorization numbers or indicated authorization was not needed when MOLINA knew what services were being provided and 2) MOLINA gave authorizations or indicated none was needed with the intent to induce MHN to provide services to the MOLINA' members.

54.    In addition, prior course of conduct by MOLINA included MHN submitting claims to MHN and in response, MOLINA would properly pay the usual and customary value of those claims. From January 1, 2020 to present, MHN has billed numerous claims and MOLINA has satisfactorily paid on a number of claims submitted by MHN in the near identical manner and method as the facts alleged herein.

55.    MOLINA knew that MHN would not provide services to the MOLINA's members gratuitously.

56.    MOLINA's provisions of authorization or assurance that authorization was not required was done so only after it had determined that MOLINA would assume responsibility for the reimbursement of the claims.

57.    MOLINA promised its beneficiaries (including Patients) that it would pay medical providers who provided emergency and necessary medical treatment to those beneficiaries in exchange for Patients' premiums and collected such premiums.

58.    MOLINA has refused, despite MHN's repeated demands, to fully and properly pay MHN the reasonable and customary value of the medical care rendered to MOLINA's beneficiaries as specified in Ex. A. MOLINA has unjustly benefitted by not paying fully MHN for the reasonable value of such services.

### Benefits Provided To and Retained Unjustly By MOLINA

59.    MOLINA further unjustly and directly benefitted when it caused MHN to treat its

beneficiaries, Patients, thus improving MOLINA's patient-population risk pool as Patient was now healthier and less of a cost exposure risk to MOLINA's insurance funds and allowing MOLINA's profits to continue with further guarantee that a healthier and still living Patient would ensure that the MOLINA would be allowed to collect future premiums for Patients' enrollment in MOLINA's health plan.

60.     MOLINA further unjustly and directly benefited when it caused MHN to treat its beneficiaries, Patients, in the following ways:

61.     **Improved Health Outcomes** – MOLINA has a vested interest in keeping their enrollees, like Patients, healthy, as healthier individuals require less medical care and incur fewer costs. By encouraging their enrollees, like Patients, to seek medical care when needed, including hospitalization, when necessary, MOLINA helped prevent Patients' illness from becoming more serious and costly for MOLINA.  Further, prompt care helped Patients return to work sooner, keeping them as a premium-paying policyholder and made claims more predictable. The treatment provided prevented relatively small medical events from becoming "catastrophic claims" that hit MOLINA's stop-loss or reinsurance layers.

62.     **Better Customer Satisfaction** – when Patients received quality care at MHN, Patients were more satisfied with their health insurance coverage which led to increased loyalty and retention rates for MOLINA.

63.     **Increased Market Share** – by offering competitive coverage that includes access to high-quality hospitals, like MHN, MOLINA was able to attract new customers and retain existing ones. This helped them gain a larger share of the market which led to increased profits and better bargaining power with healthcare providers.  In marketing, MOLINA was able to promote that they provide robust emergency coverage—making their plans more attractive to

employers and individuals.

64.    **Cost Savings** – with an improved health outcome of Patients, MOLINA saved money by avoiding further future costly treatments and is therefore able to keep premiums lower for their customers, further increasing MOLINA's attractiveness and competitiveness in expanding its patient-pool.

65.    **Cost Control via Contracted/ or Usual and Customary Rates** – When MHN was in-network or had a single case rate agreement, MOLINA paid the negotiated rate, which was typically lower than MHN's billed charges.   Even when MHN was out of network, MOLINA still had leverage to pay "usual and customary" or statutory rates rather than full charges (e.g., state balance-billing laws, Medicare-based payment caps in certain contexts).

66.    **Cost Avoidance from Downstream Care** - Early ER intervention prevented costlier care later, e.g., preventing ICU admission, severe complications, or prolonged disability.

67.    **Reduced Need for Post-Emergency Litigation or Liability** – MHN's  prompt treatment lowered the chance that Patients (or their attorneys) could claim MOLINA delayed or denied urgent care, which could have lead to costly lawsuits or bad-faith claims against MOLINA.

68.    **Regulatory & Legal Compliance Benefits** – MOLINA was under implied obligations under EMTALA and direct obligations under the Prudent Layperson Standard (federal and Nevada state laws) that required MOLINA to provide coverage for conditions a reasonable person would think need immediate attention.

69.    **Avoidance of Regulatory Penalties** – Inducing MHN to provide care to  Patients that met legal standards helped MOLINA avoid fines or corrective action from state insurance departments.

70.    **Defense Against "Bad Faith" Accusations** – Had a Patient suffered harm due to

denial or delay of medical services, MOLINA could risk major reputational and legal damage. MOLINA's inducement of MHN to provide care to Patients preemptively limited that exposure.

71.     **Claims Management & Cost-Sharing Leverage** – After Patient's were discharged, MOLINA was able to channel Patients into in-network follow-up care, keeping future costs down.

### *Claims At Issue*

72.     Despite MHNs' proper submission of claims for reimbursement, MOLINA has failed to properly pay MHN for medical services supplies and/or equipment rendered to the Patients.

73.     Prior to admission and/or following stabilization in MHNs' emergency department, MHN contacted MOLINA and/or its agents to ascertain whether or not MOLINA was responsible for the costs associated with the medically necessary services, supplies and/or equipment rendered to patients.    In response, MOLINA Plan's agent verified to MHN the relevant insurance verification and insurance coverage eligibility information for Patients under MOLINA's health plan and indicated that authorization was not required or provided an authorization number.

74.     At all relevant times, MOLINA's Plan held itself out to be the responsible payor for the services provided to patients.  MOLINA gave authorization reference numbers or indicated no authorization was needed and approved the medically necessary services rendered to Patients. In fact, MOLINA paid a portion of the billing for all claims being made in this Complaint. MOLINA was aware and knew that they are responsible for paying for each of their insureds.

75.     Rather than properly and fully pay MHN for the medically necessary services, supplies, and/or equipment MHN rendered to the Patients, MOLINA underpaid, issuing payments of $1,199.75. To date, MOLINA owes MHN no less than $390,805.36. Ex. A.

## COUNT I – BREACH OF IMPLIED-IN-FACT CONTRACT
(Against Defendant MOLINA and DOES 1 through 25, inclusive)

76.    MHN incorporates by reference and re-alleges paragraphs 1-75 of this Complaint here as though set forth in full.

77.    By conduct alone and with no express agreement between them — an implied-in-fact contract arose between MHN and MOLINA each time one of the Patients presented to MHN their insurance card and/or otherwise identified themself as being a member/beneficiary of a health plan financed, sponsored, and/or administered by MOLINA.

78.    Each of the Patients specified in Exhibit A presented an identification card issued by MOLINA and/or otherwise identified themself as belonging to a health plan financed, sponsored, and/or administered by MOLINA at the time of their hospital stay at MHN on the Dates of Service.

79.    Accordingly, each time one of the Patients sought medical treatment at MHN and so identified themself, an implied-in-fact contract arose in which MHN agreed to render to that Patient all medically necessary services, supplies, and/or equipment needed by that individual. In return, MOLINA agreed to pay for such care.

80.    MHN's usual and customary charges for rendering the medically necessary services, supplies, and/or equipment to the Patients set forth in Exhibit A, amounted to $392,421.11. However, MOLINA only paid $1,199.75, leaving a deficit of $390,805.36 which amounted to a breach of its implied-in-fact contracts with MHN.

81.    No express written contract between MOLINA and MHN existed to prescribe payment for the medically necessary services, supplies, and/or equipment rendered to Patients and MHN did not perform those services gratuitously. Rather, MOLINA knew and understood that MHN rendered such treatment with the expectation of being paid.

82.    Prior to the treatment rendered by MHN, through industry custom and practice, MOLINA impliedly agreed, promissorily impliedly expressed and understood that MHN would render medically necessary care to MOLINA beneficiaries, submit bills for such care to MOLINA, and that MOLINA would pay MHN for the necessary medical treatment rendered to Patients, rather than Patients themselves (except for co-payments, deductibles, and co-insurance amounts, in any).

83.    Specifically, MHN contacted MOLINA to verify Patients' healthcare eligibility under a MOLINA health plan, to obtain authorization from MOLINA for the medical services rendered and to be rendered, and to establish its right to be paid by MOLINA for such care. In response, MOLINA represented that Patients were beneficiaries of one of MOLINA's health plans.

84.    At no time did MOLINA represent that it would not pay MHN for the necessary medical treatment rendered to Patients.

85.    Through MHN's treating the Patients and MHN's initiating contact with MOLINA as described above, Plaintiff and Defendant entered into an implied-in-fact contract. The Contract was also formed through industry custom and practice, as well as Plaintiff and Defendant's prior and on-going course of conduct. Prior course of conduct included, among other things:

    a)    MOLINA's issuance of identification cards to Patients;

    b)    MOLINA's instructing Patients to present such identification cards to medical providers so as to give assurances to those medical providers that such care would be paid for;

    c)    MHN communicating with MOLINA to ask for authorizations to render medical care to Patients and MOLINA issuing authorizations to MHN for such care;

d) MOLINA communicating to MHN the medical eligibility benefits for Patients without advising MHN that MOLINA would not make full payment for the services to be provided to Patients;

e) MOLINA sending written approvals to MHN for the specified medical services for Patients;

f) MOLINA requesting that MHN send MOLINA clinical information and medical records.

86.    In addition, prior course of conduct by MOLINA included MHN submitting claims to MOLINA and in response, MOLINA would properly pay the discounted rates under the Contract for those claims. Over the last five (5) years, MHN has billed numerous claims and MOLINA has satisfactorily paid on a number of claims submitted by MHN in the near identical manner and method as the facts alleged herein.

87.    MOLINA directly and deliberately benefited from those services by prompting, through its words and prior and ongoing conduct, and through the custom and practice in the healthcare industry, that MHN perform those services on Patients who were beneficiaries of MOLINA, thus fulfilling MOLINA's obligation to secure medically necessary healthcare for its beneficiaries. When Patients received those services, the express insurance coverage agreement made between MOLINA and Patients was satisfied and MOLINA was able to retain rightfully the premiums paid on behalf of Patients for enabling Patients to receive the medical care performed by MHN. Further, MHN directly conferred a benefit upon MOLINA when it helped MOLINA make good on promises MOLINA made to its own members/beneficiaries that it would arrange for them to receive timely medical care, when necessary, at a first-rate medical facility.

88.     MHN provided medically necessary care to MOLINA beneficiaries as described above.

89.     MHN properly billed MOLINA for the medically necessary services provided to Patients as listed in Ex. A.

90.     MOLINA breached the implied-in-fact contract by paying only $1,199.75, resulting in an aggregate underpayment of $390,805.36 for the medical services performed by MHN.

91.     MHN performed all conditions required on its part to be performed in accordance with the terms and conditions of the implied-in-fact contract.

92.     MOLINA breached the implied-in-fact contract by underpaying MHN for the medically necessary services, supplies and/or equipment rendered or supplied to Patients.

93.     As a direct and proximate result of MOLINA's breach of the implied-in-fact contract, MHN suffered damages in an amount to be proven at trial but not less than the sum of $390,805.36, exclusive of interest.

94.     WHEREFORE, MHN prays this Court enter judgment in its favor and against MOLINA as follows:

a)   For the principal sum of $390,805.36;

b)   For interest on such principle sum at the rate of at the legal rate as provided by West Virginia Code §56-6-31, from the date the cause of action accrued until the date of judgment; and

c)   For such other and further relief as the Court deems just and proper.

### COUNT II – QUANTUM MERUIT *(IN THE ALTERNATIVE)*
(Against Defendant MOLINA and DOES 1 through 25, inclusive)

95.     MHN incorporates by reference and re-alleges paragraphs 1-75 of this Complaint here as though set forth in full.

96.    On the dates of service set forth in Ex. A, MHN provided emergency and/or medically necessary care to Patients.

97.    In the alternative, assuming *arguendo* that it is determined that no express or implied-in-fact contract between MOLINA and MHN existed, and/or that such a contract cannot be enforced as to the payment for the medically necessary services, supplies and/or equipment rendered to Patients, Plaintiff should nevertheless be fully paid under the common law doctrine of *quantum meruit*.

98.    MHN did not perform these services gratuitously. Rather, MOLINA, by its words and prior and ongoing conduct, and through the custom and practice in the healthcare industry, knew and understood that MHN rendered such treatment with the expectation of being paid.

99.    Prior to the treatment rendered by MHN to Patients, through industry custom and practice, MOLINA impliedly agreed and understood that MHN would render medically necessary services to MOLINA beneficiaries, submit bills for such care to MOLINA, and that MOLINA would pay the usual and customary value to MHN for the necessary medical treatment rendered to Patients, rather than Patients themselves (except for co-payments, deductibles, and co-insurance amounts, in any).

100.    Specifically, prior to the dates that MHN admitted Patients to its facilities for medical services, MHN contacted MOLINA to verify Patients' healthcare eligibility under a MOLINA health plan, to obtain authorization from MOLINA for the medical services rendered and to be rendered, and to establish its right to be paid by MOLINA the usual and customary value for such care. In response, MOLINA represented that Patients were beneficiaries of one of MOLINA's health plans, provided authorization numbers incorporated herein, and approved admission of Patients.

101.    At no time did MOLINA represent that it would not pay the usual and customary value to MHN for the necessary medical treatment rendered to Patients and at no time did MHN represent that it would perform the services gratuitously.

102.    By treating Patients and initiating contact with MOLINA as described above, MHN provided a benefit to MOLINA and MOLINA failed to compensate properly MHN for that received benefit, despite the prior and on-going course of conduct between MHN and MOLINA. Prior course of conduct included, among other things:

a)  MOLINA's issuance of identification cards to Patients;

b)  MOLINA's instructing Patients to present such identification cards to medical providers so as to give assurances to those medical providers that such care would be paid for;

c)  MHN communicating with MOLINA to ask for authorization to render medical care to Patients and MOLINA issuing authorization to MHN for treatment for that care;

d)  MOLINA communicating to MHN the medical eligibility benefits for Patients without advising MHN that MOLINA would not make full payment of the usual and customary value of the services to be provided to Patients;

e)  MOLINA sending written approval to MHN for the specified medical services for Patients;

f)  MOLINA requesting that MHN send MOLINA clinical information and medical records.

103.    In addition, prior course of conduct by MOLINA included MHN submitting claims to MOLINA and in response, MOLINA would properly pay the usual and customary value of those claims. Over the last five (5) years, MHN have billed numerous claims and MOLINA has

satisfactorily paid on a number of claims submitted by MHN in the near identical manner and method as the facts alleged herein.

104.    In addition, MOLINA pre-verified Patients' coverage and eligibility and authorized many of the treatments.

105.    MOLINA's authorizations for the treatments were implied requests to MHN to perform those services on behalf of Patients.

106.    MHN rendered such treatments after the implied requests for such services by MOLINA and MHN intended those services to benefit, among others, MOLINA.

107.    MOLINA directly and deliberately benefited from those services by prompting, through its words and prior and ongoing conduct, and through the custom and practice in the healthcare industry, that MHN perform those services on Patients who were beneficiaries of MOLINA, thus fulfilling MOLINA's obligation to secure medically necessary healthcare for its beneficiaries. When Patients received those services, the express insurance coverage agreement made between MOLINA and Patients was satisfied and MOLINA was able to retain rightfully the premiums paid on behalf of Patients for enabling Patients to receive the medical care performed by MHN. Further, MHN directly conferred a benefit upon MOLINA when it helped MOLINA make good on promises MOLINA made to its own members/beneficiaries that it would arrange for them to receive timely medical care, when necessary, at a first-rate medical facility.

108.    MHN provided medically necessary care to the MOLINA beneficiaries as described above.

109.    MHN properly billed MOLINA for the medically necessary services provided to Patients as listed in Ex. A.

110.    MHN is informed and believes and alleges thereon that MOLINA expressly instructed its beneficiaries (including Patients) to seek medical care in an emergency from the nearest medical provider and for such beneficiaries to tell the emergency medical provider to send MOLINA the bills for such care for payment by MOLINA (except for co-payments, deductibles and co-insurance amounts, if any).

111.    After MHN rendered the care specified in Ex. A to Patients, MHN properly and timely billed MOLINA for such care.

112.    The reasonable value of the medical care provided was and is the usual and customary charges of those services that is the total billed charges in the bills submitted to MOLINA by MHN for $392,421.11. MOLINA paid only $1,199.75, leaving a deficit of $390,805.36 owed to MHN.

113.    Despite demands thereon, MOLINA has refused to pay fully MHN for the medical care rendered to Patients as set forth in Exhibit A.

114.    MHN did not perform these services gratuitously, but rather expected to be paid the reasonable and customary value for such services which amounts to $392,421.11.

115.    MOLINA unjustly benefitted by not paying fully MHN for the reasonable value of such services. MOLINA promised its beneficiaries (including Patients) that it would pay medical providers who provided emergency and necessary medical treatment to those beneficiaries in exchange for Patients' premiums, collected such premiums and then refused despite demands to fully and properly pay MHN the reasonable and customary value of the medical care rendered to MOLINA's beneficiaries as specified in Ex. A. MOLINA accepted the services MHN provided to Patients as demonstrated by acts including but not exclusive to issuing authorizations and collection of premiums.

116. As a direct and proximate result of MOLINA's misconduct, MHN has suffered damages in an amount to be proven at trial but not less than the sum of $390,805.36, exclusive of interest.

117. WHEREFORE, MHN prays this Court enter judgment in its favor and against MOLINA as follows:

a) For the principal sum of $390,805.36;

b) For interest on such principle sum at the rate of at the legal rate as provided by West Virginia Code §56-6-31, from the date the cause of action accrued until the date of judgment; and,

c) For such other and further relief as the Court deems just and proper.

Dated: November 4, 2025

Respectfully submitted,

LAW OFFICES OF STEPHENSON, ACQUISTO & COLMAN, INC.

By:    /s/ *Lauren K. Miller*
One of the Attorneys for Plaintiff

Marcus R. Morrow, Esq., WV. Bar No. 14520
Lauren K. Miller, Esq., WV. Bar No. 14735
LAW OFFICES OF STEPHENSON, ACQUISTO & COLMAN, INC.
20 N. Clark St., Suite 3300
Chicago, IL 60602
Phone: (312)-626-1870
Fax: (818)-559-5484
mmorrow@sacfirm.com (cc: lbencomo@sacfirm.com)
lmiller@sacfirm.com (cc: sboyd@sacfirm.com)

**ST. MARY'S MEDICAL CENTER V. MOLINA HEALTHCARE, MOLINA HEALTHCARE OF OHIO**

E-FILED | 11/4/2025 3:58 PM
CC-06-2025-C-528
Cabell County Circuit Clerk
Michael J. Woelfel

**FC 36099**

| No. | Admit Date | Discharge Date | Total Charges | Total Paid | Underpaid |
|-----|-----------|----------------|--------------:|-----------:|----------:|
| 1 | 1/4/2024 | 1/4/2024 | $ 9,345.55 | $ - | $ 9,345.55 |
| 2 | | 2/22/2023 | $ 9,493.00 | $ - | $ 9,493.00 |
| 3 | | 10/10/2023 | $ 3,936.00 | $ - | $ 3,936.00 |
| 4 | 12/1/2019 | 12/20/2019 | $ 94,390.30 | $ - | $ 94,390.30 |
| 5 | 8/12/2023 | 8/14/2023 | $ 18,997.75 | $ - | $ 18,997.75 |
| 6 | 8/11/2022 | 8/11/2022 | $ 12,265.15 | $ 553.72 | $ 11,711.43 |
| 7 | 1/6/2022 | 1/12/2022 | $ 31,124.55 | $ - | $ 31,124.55 |
| 8 | 9/30/2024 | 10/5/2024 | $ 47,302.01 | $ - | $ 47,302.01 |
| 9 | 12/2/2023 | 12/5/2023 | $ 28,457.45 | $ - | $ 28,421.45 |
| 10 | 5/13/2023 | 5/14/2023 | $ 6,104.95 | $ 646.03 | $ 5,078.92 |
| 11 | 11/2/2023 | 11/3/2023 | $ 131,004.40 | $ - | $ 131,004.40 |
| | | | $ 392,421.11 | $ 1,199.75 | $ 390,805.36 |

# SUMMONS

**Case Number:**

CC-06-2025-C-528

## IN THE CIRCUIT COURT OF CABELL COUNTY, WEST VIRGINIA
## MARSHALL HEALTH NETWORK d/b/a ST. MARY'S MEDICAL CENTER, Glendale v. MOLINA HEALTHCARE OF OHIO, INC.; and DOES 1 THROUGH 25, INCLUSIVE

Service Type:    Filer - Private Process Server

NOTICE TO:    MOLINA HEALTHCARE OF OHIO, INC.; and DOES 1 THROUGH 25, INCLUSIVE, CORPORATION SERVICE COMPANY, 1160 DUBLIN ROAD, SUITE 400, COLUMBUS, OH 43215

Lauren Miller, 1114 Dover Ct, , Batavia, IL 60510

SERVICE:

| | |
|---|---|
| 11/4/2025 3:58:36 PM | /s/ Michael J. Woelfel |
| Date | Clerk |

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint t _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling or usual place of abode to

_____ , someone who is eighteen (18) years of age or above and resides there.

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____ , an agent or attorney-

in-fact authorized by appointment or statute to receive service of process for the individual.

☐ I have reviewed documentation authorizing the above-named person to accept service on behalf of the individual named on the summons.

☐ I have not reviewed documentation authorizing the above-named person to accept service on behalf of the individual named on the summons.

☐ Not Found in Bailiwick

| | |
|---|---|
| Date | Server's Signature |

**CC-06-2025-C-528**
**MARSHALL HEALTH NETWORK d/b/a ST. MARY'S MEDICAL CENTER, Glendale v. MOLINA HEALTHCARE OF OHIO, INC.; and DOES 1 THROUGH 25, INCLUSIVE SERVICE RETURN**

/s/ Chad S. Lovejoy
Circuit Court Judge
Ref. Code: 25MO1AVFX

E-FILED | 11/6/2025 1:18 PM
CC-06-2025-C-528
Cabell County Circuit Clerk
Michael J. Woelfel

## In the Circuit Court of Cabell County, West Virginia

**MARSHALL HEALTH NETWORK
d/b/a ST. MARY'S MEDICAL CENTER,
Glendale,**
Plaintiff,

v.

**MOLINA HEALTHCARE OF OHIO,
INC.; and DOES 1 THROUGH 25,
INCLUSIVE,**
Defendant

Case No. CC-06-2025-C-528
Judge Chad S. Lovejoy

### INITIAL CASE ORDER

Pursuant to the West Virginia Rules of Civil Procedure and the West Virginia Trial Court Rules, which place an affirmative duty upon trial courts to ensure the prompt, fair, and cost-effective resolution of civil matters, this Court hereby **ORDERS** that, within seventy-four (74) days of effective service of process having been achieved as to any defendant named in this action, the following shall be filed by one or more parties to this action:

(1) a written report outlining the parties' proposed discovery plan under Rule 26(f) of the West Virginia Rules of Civil Procedure, provided that, if included in the report, any deadline for completing discovery, completing mediation, and filing pre-trial memoranda, along with dates for a pre-trial conference and trial will be binding upon the parties and the Court only if they are set during a scheduling conference with the Court and either;

(2) a written request that the Court conduct a scheduling conference, with such written request containing the names and email addresses of all counsel of record and any unrepresented litigants; or

(3) a motion setting forth good cause as to why the Court should not issue a scheduling

order within the time provided in Rule 16(b)(3) of the West Virginia Rules of Civil Procedure, provided that no such motion shall be required if, within the seventy-four-day period described above, one of the following motions is filed: a motion for default judgment, a motion to dismiss, or a motion for judgment on the pleadings.

It is further **ORDERED** that the plaintiff(s) shall timely provide a copy of this Order to any defendant upon whom it has served process.

The Clerk is directed to provide a copy of this Order to counsel for the plaintiff(s) or to plaintiff(s) directly if unrepresented by counsel.

Entered this ___ day of ____, 2025.

**/s/ Chad S. Lovejoy**
Circuit Court Judge
6th Judicial Circuit

Note: The electronic signature on this order can be verified using the reference code that appears in the upper-left corner of the first page. Visit www.courtswv.gov/e-file/ for more details.